IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

Case No. 2:22-CV-00008-M

BULLDOG ERECTORS, INC.,

     Plaintiff,

v.                                                                          ORDER

FLATIRON CONSTRUCTORS, INC.,

     Defendant.

     This matter comes before the court on Bulldog Erector's ("Bulldog") Motion for Partial Summary Judgment. [DE 65]. For the following reasons, the motion is GRANTED IN PART and DENIED AS MOOT IN PART.

**I.    Statement of the Case**

     This is a lease dispute between two construction companies. Bulldog initiated this action against Flatiron Constructors ("Flatiron"), alleging that Flatiron breached six leasing agreements for cranes by failing to repair the Equipment as required by the Leases and make timely and sufficient lease payments. [DE 13] at 6. Flatiron filed several counterclaims, alleging primarily that Bulldog breached the Leases by delivering the cranes with latent defects. Am. Ans. [DE 94] at 17–18. [1] Bulldog seeks summary judgment as to all of Flatiron's Counterclaims, Flatiron's Eighth Defense, and Bulldog's claim for Declaratory Judgment. *Id.*

---

[1] Flatiron's Amended Answer and Amended Counterclaims [DE 94] was filed after the pending motion. However, in a then-pending Motion for Leave to File, Flatiron attached a proposed copy of the Amended Answer and Amended Counterclaims. [DE 58-2]. Both parties treated this as the operative pleading. [DE 66] at 2, n1. The court follows suit.

## II.    Background

Bulldog is a single-member limited liability company owned and operated by Robert Shirley out of Newberry, South Carolina. Pl.'s Stmt. Mat. Facts [DE 67] at ¶ 1. Bulldog's primary business is bare-leasing cranes. *Id.* In a bare-lease, the lessor typically provides the crane and its accessory equipment, and the lessee is responsible for providing the operator and maintaining the crane.

Flatiron is a multi-national construction company headquartered in Broomfield, Colorado. [DE 81] at ¶ 2. It is a subsidiary of Hochtef AG, an international construction service provider. *Id.* at ¶ 2.

In or around 2018, Flatiron was awarded a contract from the North Carolina Department of Transportation ("NCDOT") to raise N.C. Highway 12 onto a 2.4-mile bridge that extends over Pamlico Sound between the southern end of Pea Island National Wildlife Refuge and the village of Rodanthe. Am. Compl. [DE 13] at ¶ 8; Am. Ans. [DE 94] at ¶ 8. Flatiron subsequently entered into an agreement with Bulldog to lease six lattice boom crawler cranes (the "Equipment") pursuant to the terms of six separate Equipment Rental Agreements ("the Leases") dated May 17, 2018. *See* [DE 66-2]. The Leases were not executed until August 14, 2018. The rental rate for the Equipment was an aggregate of $166,000 per month. *Id.*

Prior to entering the Leases, Flatiron sent two employees—a certified crane operator and a field engineer—to Bulldog's facility in Newberry, South Carolina, where at least some of the Equipment was being stored. Depo. [DE 66-5] at 128:11–23. Bulldog states that the two

2

employees travelled to the facility to "inspect the available cranes,"[2] [DE 67] at ¶ 9, while Flatiron

argues they went only verify that the cranes were present.[3] [DE 81] at ¶ 9.

In July 2018, Flatiron informed the NCDOT that cranes would remain at Bulldog's facility

in Newberry until they were required for construction so that the cranes could be kept in a salt-free

environment and receive periodic minor maintenance. Depo. [DE 66-5] at 182:16–184:9.

## Delivery and Assembly

Article 8 of the Leases states:

Lessee hereby agrees that Equipment is shipped to Lessee in good serviceable condition. Lessee shall examine Equipment promptly upon delivery and notify Lessor in writing of readily observable defects within twenty-four (24) hours of readily observable evidence that Equipment is not in such condition. Once Equipment is fully erected, Lessee shall employ a Qualified Person to conduct an Initial/Periodic Inspection. Upon receipt of the Inspection results, Lessor shall have reasonable time to make all corrections required to render the Equipment legally operational as defined by local, state, and national codes and standards. Should Lessor be unable for any reason (other than as a result of any act of omission of Lessee, or any event beyond the control of Lessor) to repair or replace the Equipment within such time, Lessee may terminate this Agreement (only upon written notice to Lessor at least ten (ten) days prior to termination date).

[DE 66-2] at ¶ 8. This passage is followed by the bolded statement: "The foregoing is the

exclusive and entire warranty given in connection with the equipment." *Id.*

Once the Equipment was delivered and erected, Flatiron hired Tidewater Testing Services,

Inc. ('Tidewater") to conduct an initial inspection of the Equipment. Depo. [DE 67-4] at 125:6–

24. Neither Tidewater nor the daily initial daily inspections completed by Flatiron's crane

operators noted the presence of rust or corrosion. *See* [DE 68-2, 68-3]. The parties dispute whether

---

[2] In support of this claim, Bulldog cites deposition testimony of Edward Holmes. *Id.* Holmes stated that to his knowledge, the employees "went and inspected the available cranes." [DE 66-5] at 4. He clarified, however, that the purpose of the trip was "a better question for Jerad [Arno]." *Id.*

[3] In support of this claim, Flatiron points to testimony from Jerad Arno, the certified crane operator, who testified that the employees traveled to the facility only to verify whether the Equipment was present, although he was not able to determine which cranes at the facility were designated to be sent to Flatiron. Depo. [DE 68-4] at 77:21–78:15; 92:8–11.

3

Flatiron identified any defects in the Equipment or made any request for repairs upon delivery.[4]

*See* Pl.'s Stmt. Mat. Facts [DE 67] at ¶ 15; Def's Resp. [DE 81] at ¶ 15.

## During the Project

Article 10 of the Leases states in relevant part:

> The Lessee shall assure that the Equipment is not subject to careless or needlessly rough usage, and Lessee hereby agrees to employ competent, experienced persons to operate and maintain said Equipment and shall at its own expense maintain the Equipment in good operating condition, well-greased, oiled, cleaned and repaired, and shall return it to Lessor in such condition. Lessee shall have the duty to periodically inspect, test, and certify at its own cost, that the Equipment is in accordance with specifications and is fully operational and free from any and all damages and/or defects upon receipt of Equipment free from any and all damages and/or defects as required in Article 8. In the event the Equipment is rendered not serviceable through accidental and/or negligent damage by Lessee, the rental shall continue until the Equipment is restored to serviceable condition, and all costs for accomplishing the repairs shall be paid by Lessee . . . Lessee shall be responsible to clean the Equipment after its use thereof is completed. Lessee shall pay special attention toward cleaning and protecting the Equipment when working the Equipment at a location where destructible chemical agents are present in the atmosphere. Lessee shall be responsible for this protection and to dean all corrosive agents from the Equipment, and restoring the condition of the metal and paint on the Equipment prior to returning the Equipment to Lessor.

[DE 66-2] at ¶ 10.

Mark Knox, Bulldog's Service Manager, testified that in February 2020, he notified Jerad Arno, Flatiron's construction manager, as to the presence of rust on the Equipment.[5] Depo. [DE 80-16] at 222:14–224:21. Arno testified that he did not pay "specific attention" to the presence of corrosion on the Equipment, as he "was busy with other portions of the project" and corrosion did

---

[4] Flatiron points to deposition testimony made by Edward Holmes, where he states that "[t]here was a crane that was slammed full of algae" and "[t]here was hose couplings that didn't link up." Depo. [DE 81-3] at 73:16–21.

[5] In support of this contention, Bulldog identifies two emails where Knox wrote to Arno and expressed his concern that parts of the crane were "severely rusted" and that the electrical harnesses were beginning to have "issues with saltwater intrusion." [DE 67] at ¶ 22. These emails were not provided by either party in connection with the pending motion.

4

not impact his day-to-day responsibilities. Depo. [DE 68-4] at 59:8–60:17. Towards the end of the project, however, he admitted to noticing corrosion on the Equipment. *Id.*

An expert witness for Flatiron testified that once corrosion is observed, it should be noted on the daily inspection reports, and remediation measures should be taken.[6] Depo. [DE 81-5] at 183:1–184:6. While the daily inspection reports did not note the presence of rust, *see* [DE 68-3], the parties agree that Flatiron knew that some components of the Equipment contained rust. They do not agree, however, whether remediation measures were taken after the presence of rust was identified by Bulldog. *Compare* Pl.'s Stmt. Mat. Facts [DE 67] at ¶ 24 (stating that "[t]here is no evidence of any remediation performed by Flatiron to any corrosion on the Cranes prior to the end of the Project"), *with* Def's Resp. [DE 81] at ¶ 24 (identifying several Purchase Orders made by Flatiron to "pay for repairs or replacement to rusted and/or corroded crane components identified by Bulldog" in its Service Recap Reports).

## Disassembly and Repairs

Before the Equipment was disassembled, Flatiron realized that, pursuant to the Leases, it was obligated to restore the cranes to their prior condition.[7] *See* [DE 68-7] ("We are getting ready to start tearing down the cranes out here and unfortunately realized our agreement with Bulldog says we'd take care of reconditioning the cranes to match the condition when originally received prior to them pricking the cranes up."). Flatiron commissioned several third-party contractors to

---

[6] Flatiron emphasizes that the expert qualified his testimony by stating that the importance of remediation depends on where the rust is observed. [DE 81] at ¶ 23. For example, when asked whether corrosion needed to be remediated, the expert answered, "depending on what item you're looking at, yes." Depo. [DE 81-5] at 183:13–15. The expert stated that cables and lacings are critical items that would need to be addressed quickly should rust form. *Id.* at 183:20–25.

[7] Bulldog additionally submits an email chain where Bulldog identifies the presence of rust on the Equipment and the provision of the Leases that require Flatiron to repair the Equipment prior to returning it. [DE 68-6]. In the email chain, Flatiron admits that it is obligated to restore and replace certain components of the Equipment. *Id.* Flatiron objects to the court's consideration of the emails, arguing that they are inadmissible hearsay. [DE 81] at ¶ 26–28. Ultimately, these emails do not impact the court's analysis of the counterclaims to which Bulldog seeks summary judgment.

complete maintenance and make certain repairs. Am. Comp. [DE 13] at ¶ 28; Am. Ans. [DE 94] at ¶ 28. One of these third-party contractors, MGX Equipment Services, Inc. ("MGX"), explicitly noted that the purpose of the work was to "repair damage caused by environmental exposure." [DE 68-8] at 21.

On December 7, 2021, Bulldog notified Flatiron that Flatiron contractors were painting over rusted components of the Equipment. [DE 69-2] at 1. On December 29, 2021, Bulldog sent another email, providing to Flatiron a list of several components that Bulldog believed needed to be replaced. [DE 69-1] at 1. In the email chain, Flatiron expressed its belief that Bulldog was attempting to compel Flatiron to restore the Equipment to a condition superior to what is required by the Leases. *Id.* at 5. Flatiron stated that when the Equipment was delivered, it had latent paint defects[8], algae in the fuel tanks, and hydraulic couplings that failed to connect. *Id.*

However, Flatiron continued to make repairs on the Equipment[9], and on June 16, 2022, it sent Bulldog a termination notice, stating that repairs on two of the cranes (#1370 and #1017) were complete. [DE 69-4] at 1–2. On September 28, 2022, Flatiron sent supplemental notices of termination for the remaining cranes, indicating that all repairs for which Flatiron was responsible had been completed. [DE 69-6]. Bulldog sent an ESI expert to visually inspect the disassembled Equipment, and in his report, he noted that as of December 1, 2022, the repairs were ongoing, and that "none of the six cranes are able to be placed in service in their current condition." [DE 69-7] at 25.

---

[8] Flatiron's coating expert, Kerry Corley, visited the project site in November 2021 to inspect the Equipment. Depo. [DE 81-8] at 139:2–7. After inspection, he identified numerous paint defects which could have exacerbated the development of rust. *Id.* at 184:13–188:23. In its breach of contract counterclaim, and as described in this paragraph, Flatiron alleges that these were latent defects that existed at the time of delivery. [DE 94] at 17–18.
[9] Bulldog initiated this action against Flatiron in the interim, on February 11, 2022.

## III.    Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if proof of its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is genuine "if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Id.* When determining whether a genuine issue of material fact has been raised, the court must "view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (internal citations omitted).

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes this threshold showing, the burden shifts to the non-moving party to show that "specific, material facts exist that give rise to a genuine issue." *Wai Man Tom*, 980 F.3d at 1037 (citing *Celetox Corp.* 477 at 324). It is insufficient for the non-movant to rely on allegations made in the pleadings or "conclusory allegations or denials." *Id.* Likewise, the "mere existence of a scintilla of evidence" in the non-movant's favor is insufficient to withstand summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

7

## IV.    Discussion

### A.    Flatiron's Breach of Contract Counterclaim

Flatiron alleges that Bulldog breached the leasing agreement by (1) failing to deliver the Equipment in "good serviceable condition"; (2) collecting rental fees from Flatiron before it owned or possessed the Equipment; (3) refusing to accept the return of the Equipment from Flatiron until they were "improved to a condition beyond the requirements of the Agreements"; and (4) "refusing to hold Flatiron harmless for any and all damages attributable to latent defects." [DE 94] at 16–18.

Bulldog argues that summary judgment should be granted in its favor because (1) the terms of the lease affirmatively establish that the cranes were delivered in "good serviceable condition"; (2) there is no evidence that all six cranes shared a common defect; and (3) any defects that existed were readily observable at the time of the crane's delivery and assembly, thereby making them not latent. [DE 86] at 14–16.

Under North Carolina law, "[t]he elements for breach of contract are (1) the existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). For a breach to be actionable, it must be material. *Supplee v. Miller-Motte Bus. Coll, Inc.*, 239 N.C. App. 208, 220, 768 S.E.2d 582, 593 (2015). A breach is material when it "substantially defeats the purpose of the agreement or goes to the very heart of the agreement or can be characterized as a substantial failure to perform." *Id.* "The question of whether a breach of contract is material is ordinarily a question for the jury." *Id.* at 221, 768 S.E.2d at 593.

8

There is no dispute that the Leases are valid contracts. *See* Am. Comp. [DE 13] at ¶ 34; Am. Ans. [DE 94] at ¶ 43. Flatiron's breach of contract counterclaim, therefore, hinges on whether Bulldog materially breached its obligations under the Leases.

### 1. Stipulation in the Lease Argument

Bulldog argues that in Article 8 of the Agreements, Flatiron stipulated that the Equipment was delivered in "good serviceable condition." [DE 66] at 14. Flatiron counters that Article 8 is not a stipulation; rather, it is a warranty that the Equipment would be delivered by Bulldog in "good serviceable condition." [DE 76] at 7. Neither interpretation neatly comports with the language of the Leases, but at the very least, this argument, considered in isolation, does not warrant summary judgment.

When "the language of a contract is plain and unambiguous," its "meaning and effect is a question of law for the court." *Galloway as Trustee of Melissa Galloway Snell living Trust Dated May 1, 2018 v. Snell*, 384 N.C. 285, 288, 885 S.E.2d 834, 836 (2023) (citations omitted). The terms of such a contract "are to be taken and understood in their plain, ordinary and proper sense, *Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719–20, 140 S.E.2d 539, 541 (1962), and "harmoniously construed to give every word and every provision effect." *Galloway*, 384 at 288, 885 S.E.2d at 836 (cleaned up).

If a contract is ambiguous, however, its "meaning and effect is a factual question for the jury." *Id.* "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Register v. White*, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004). "An ambiguity can exist when, even though the words themselves appear clear, the specific facts of the case create more than one reasonable interpretation of the contractual provisions." *Id.*

The provision at issue in each of the Leases is Article 8. It reads, in relevant part:

Lessee hereby agrees that Equipment is shipped to Lessee in good serviceable condition. Lessee shall examine Equipment promptly upon delivery and notify Lessor in writing of readily observable defects within twenty-four (24) hours of readily observable evidence that Equipment is not in such condition. Once Equipment is fully erected, Lessee shall employ a Qualified Person to conduct an Initial/Periodic Inspection. Upon receipt of the Inspection results, Lessor shall have reasonable time to make all corrections required to render the Equipment legally operational as defined by local, state, and national codes and standards.

[DE 66-2] at ¶ 8. This passage is qualified by the following bolded statement: "The foregoing is the exclusive and entire warranty given in connection with the equipment." *Id.*

Article 8 is not unambiguously a stipulation that the Equipment was received in "good serviceable condition." Starting with the text, the Leases state that Flatiron agrees the Equipment was *shipped* in good serviceable condition. *Id.* Bulldog offers this phrase as evidence of a stipulation that the Equipment was *received* in such condition. [DE 66] at 14. These verbs do not mean the same thing. A "shipment" stipulation would concern the condition of the Equipment at the time it left Bulldog's possession, while a "receipt" stipulation would concern the condition of the Equipment at the time Flatiron assumed custody. There is a period of time in between these two events, and by using the word "shipped," the Leases allow for Flatiron to raise any concerns regarding harm suffered by the Equipment while in transit. *See, e.g.*, [DE 66-2] at ¶ 8 (explaining that Flatiron shall promptly notify Bulldog of evidence of readily observable defects).

With that in mind, however, Article 8 is not merely a guarantee by Bulldog that it will deliver the Equipment in good condition. The plain language of the article discusses what *Flatiron* "hereby agrees" to. [DE 66-2] at ¶ 8. To interpret this provision as a warranty by *Bulldog* would render this language without meaning; indeed, Flatiron has yet to identify what it would supposedly be agreeing to if, in fact, the sentence operated only as an unrealized promise. The only reasonable interpretation of the language, then, is the obvious interpretation—i.e., that

10

Flatiron agreed that the Equipment for which it assumed custodial responsibility was devoid of any readily observable defects at the time the contracts were entered into. It matters not whether Flatiron actually inspected the Equipment to verify whether this was true. Flatiron signed contracts that spoke declaratively about the condition the Equipment, so it is estopped from now, years later, attempting to rely on an alleged discrepancy between those declarations and reality.

Flatiron argues that this interpretation is belied by two other provisions in the Leases. [DE 76] at 7–8. First, Flatiron argues that this interpretation ignores the remaining language in Article 8 that (1) required Flatiron to inspect the Equipment upon delivery for any readily observable defects; (2) required Flatiron to employ a Qualified Person after the Equipment was fully erected to inspect the Equipment for readily observable defects; and (3) allowed Flatiron to terminate the Leases if Bulldog was unable to repair any such defects within a reasonable amount of time. *Id.* at 8. Second, Flatiron argues that the interpretation ignores language in Article 10, which describes Flatiron's duty to periodically inspect the Equipment "upon receipt of Equipment free from any and all damages and/or defects *as required in Article 8.*" [DE 66-2] at ¶ 10 (emphasis added). Flatiron reads both provisions as contemplating that the Equipment might be delivered with readily observable defects. As described previously, that is true. The first sentence of Article 8 only discusses the condition of the Equipment at the time it was shipped, and because the Equipment could have suffered harm in transit, the above-described provisions allowed for Flatiron to address any newly developed defects that occurred between shipment and delivery. These provisions are consistent with the court's interpretation.

For the aforementioned reasons, Article 8 does not preclude Flatiron from alleging that the Equipment was not delivered in good, serviceable condition. However, at this stage, it does limit Flatiron from basing such claims on readily observable defects because Flatiron waived any claim

11

for defective performance by accepting delivery of the Equipment. *See Salem Realty Co. v. Batson*, 256 N.C. 298, 308, 123 S.E.2d 744, 751 (1962). Flatiron has alleged that the Equipment was delivered with latent defects, so the provisions in Article 8 do not require summary judgment in Bulldog's favor.

### 2.    No Common Defect Argument

Next, Bulldog argues that summary judgment is appropriate because "there is no evidence that all six cranes shared common defects, if any defects at all." [DE 66] at 14. Specifically, Bulldog argues that no reasonable jury could find that all cranes shared the same latent paint defects "because each of the six cranes were manufactured in different years and had different usage, paint, and repair histories over a span of approximately twenty years before they arrived at the Project." *Id.* at 14–15.

To start, as Flatiron points out, the breach of contract counterclaim does not allege, nor does it require, that all six cranes share precisely the same latent defect. The core of Flatiron's claim is that the cranes were not delivered in good serviceable condition. [DE 94] at 18. Flatiron alleges that because of a lack of adequate protective coating, "the Equipment endured greater exposure to the elements." *Id.* The counterclaim describes numerous ways in which these defects came into being, identifying both affirmative acts and omissions that contributed to the Equipment's need for repairs. *Id.* at 17 (alleging, for example, that Bulldog painted over areas of rust on the cranes *and* failed to ensure that the cranes were adequately coated with primer). Some of these acts and omissions might implicate numerous cranes, but it matters not whether the same negligent behavior was engaged in identically six separate times. Flatiron merely needs to show that each of the six cranes had *some* latent defect, regardless of how the defect manifested.

This argument does not preclude Flatiron from asserting a breach of contract counterclaim.

### 3. No Latent Defect Argument

Next, Bulldog argues that summary judgment is appropriate because any paint defect that existed at the time of delivery would have been readily observable and thus, not latent. [DE 66] at 16.

Under North Carolina law, "where work is accepted with knowledge that it has not been done according to the contract or under such circumstances that knowledge of its imperfect performance may be imputed, the acceptance" is generally treated as "a waiver of the defective performance." *Salem Realty Co. v. Batson*, 256 N.C. 298, 308, 123 S.E.2d 744, 751 (1962). This rule does not apply to latent defects. *Id.* "A latent defect is a defect which is not 'obvious or discoverable upon a reasonable inspection.'" *Benigno v. Sumner Constr., Inc.*, 278 N.C. App. 1, 6, 862 S.E.2d 46, 51 (2021) (quoting *Oates v. Jag, Inc.*, 314 N.C. 276, 281, 333 S.E.2d 222, 226 (1985)). By their nature, such defects manifest themselves after initial performance of a contract. *Gaito v. Auman*, 70 N.C. App. 21, 26, 318 S.E.2d 555, 558 (1984). For example, in *Oates*, the defects in the plaintiff's home consisted of

> the installation of a drain pipe which had been cut, the failure to use grade-marked lumber, the failure to comply with specific provisions of the North Carolina Uniform Residential Building Code pertaining to certain weight bearing requirements, improper and insufficient nailing on bridging and beams, and faulty and shoddy workmanship.

*Oates*, 314 N.C. at 277. The North Carolina Supreme Court held that these were latent defects because they were "of such a nature than a jury could find they would not ordinarily be discovered by a purchaser during a reasonable inspection." *Id.* at 281–82.

Bulldog's argument largely relies on deposition testimony made by Kerry Corley, a protective coating specialist hired by Flatiron, who testified as to both the visibility of chalking[10] and corrosion on the Equipment at the time it was delivered. [DE 66] at 16–17; *see also* Depo. [DE 81-8] at 51:4–53:4. While Corley was not present at the time of delivery, he reviewed photographs of the Equipment taken at the time they were delivered and assembled. *Id.* at 47:12–16.

Corley testified that from his review of the photographs, he could observe evidence of chalking on the Equipment. *Id.* at 47:1–11. He testified that chalking is neither hidden nor covered and that one does not need to be "a coatings specialist to know how to look for chalking." *Id.* at 51:4–52:1. However, he also testified that "a majority of people" would not be able to identify powdery substances on cranes as evidence of chalking. [DE 81-8] at 50:8–15. He confirmed that, to his knowledge, Flatiron did not raise the issue of chalking when the Equipment was delivered in 2019. *Id.* at 51:21–23. In response, Flatiron argues that while chalking itself might be readily observable, its nature as evidence of a paint defect is not. [DE 76] at 14.

Flatiron's argument rests on the presumption that a defect could only be patent if a reasonable lay person with no training or experience working at a construction site could readily identify it. North Carolina law does not support this presumption. When discussing "reasonableness," North Carolina courts routinely frame the question in terms of "reasonably prudent [people] in similar circumstances." *Nicholson v. Am. Safety Util. Corp.*, 124 N.C. App. 59, 64–65, 476 S.E.2d at 676 (1996) (explaining that an essential element of a products liability action predicated upon negligence is "evidence of a standard of care owed by the reasonably

---

[10] Corley testified that "[c]halking is when the coating [of the paint] has started breaking down and you can actually wipe portions of it away." Depo. [DE 81-8] at 47:22–24. Chalking and other coating system failures can leave the steel substrate insufficiently protected and can accelerate the development of corrosion. Decl. [DE 83-1] at ¶ 7.

14

prudent person in similar circumstances"); *Cockerham v. Ward*, 44 N.C. App. 615, 619, 262 S.E.2d 651, 654 (1980) (same). So, under these circumstances, the court must assess whether a person in Flatiron's shoes, after reasonable inspection, would have failed to observe and appreciate evidence of chalking. *See Oates*, 314 N.C. at 281–82. A reasonable jury could not come to that conclusion. Flatiron was under a contractual obligation to both inspect the Equipment upon delivery and hire a Qualified Person to ensure the Equipment did not have any readily observable defects. [DE 66-2] at ¶ 8. By any standard, such measures would have put Flatiron on notice of chalking, which as Corley testified, was readily visible to the naked eye at the time of delivery.[11] Depo. [DE 81-8] at 47:1–11. And having perceived evidence of chalking, Tidewater and Flatiron's employees— many of whom were trained to inspect these cranes to assess their condition—should have been (and were in fact) on notice that chalking was evidence of a paint defect. *See, e.g.*, Depo. [DE 69-12] at 50:7–14 (Corley testifying that Flatiron notified him in November 2021 of evidence of chalking on the Equipment).

Resisting this conclusion, Flatiron points to a declaration made by Matthew Gardiner, an employee of ICC Forensics, who stated that "[i]t would be unreasonable to expect Flatiron's third-party inspector, Tidewater Testing, to go to the lengths that Summit[12] went to during any periodic inspections during the rental period." [DE 83-3] at ¶ 4. Even taking this declaration at face value, it does not change the court's conclusion. While Tidewater may not have needed to test the paint

---

[11] Flatiron also notes that Bulldog's on-site-mechanic testified that "any time [he] had an opportunity," he would paint over areas that were "discolored or rusted" with touchup paint cans. Depo. [DE 82-9] at 66:14–67:4. Flatiron suggests that this testimony creates a genuine issue of material fact as to whether the paint defects were latent. [DE 76] at 15. It does not. While it is unclear when Bulldog's mechanic began to paint over rust, Corley testified as to photographs that were taken of the Equipment at the time they were delivered. *See* Depo. [DE 81-8] at 47:1–11. Regardless of whether this evidence was later covered up by paint, Flatiron was able to perceive the chalking and rust at the time it had a duty to inspect the Equipment.
[12] Summit Design and Engineering is the company that tested the Equipment and purportedly identified paint defects. Decl. [DE 83-1] at ¶ 1–3, 5–7. Corley was an employee of Summit. [DE 78-1] at 3, 9.

such that it could determine the precise formulation and ratios of its coating, *see* Rep. [DE 78-1] at 9, the presence of chalking was enough to put Tidewater, and by extension Flatiron, on notice that the Equipment's coating system was failing. *See* Decl. [DE 83-1] at ¶ 7.

There is no other evidence which conflicts with Corley's testimony, so a reasonable jury could not find that the paint defects were latent.

### 4. Payment before Possession Argument

Next, Bulldog argues that summary judgment is warranted as to Flatiron's breach of contract claim predicated on the theory that Bulldog accepted lease payments for cranes it did not yet own or possess. [DE 66] at 23. Flatiron advises that it has received credit for those payments and will voluntarily dismiss this component of its counterclaim. [DE 76] at 25. This portion of the motion is therefore DENIED AS MOOT.

### 5. Other Breach of Contract Theories

Finally, Defendant insists that summary judgment as to its breach of contract claim is inappropriate because it can advance other theories that do not rely on the presence of a latent defect. [DE 76] at 16. Specifically, it alleges that Bulldog breached the Leases by (1) demanding that Flatiron correct damage to the Equipment that Bulldog caused; (2) failing to complete scheduled maintenance on the Equipment; and (3) refusing to accept the return of the Equipment until Flatiron repairs the Equipment. *Id.* at 16–17.

At the outset, the court notes that Flatiron did not raise the scheduled maintenance issue in its Amended Counterclaims, so that cannot now form the basis for an alleged breach of contract. *See Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.3d 324, 336 (4th Cir. 2009) (holding a party cannot present a new theory of a claim after discovery that is not alleged in the complaint).

16

Neither remaining theory survives scrutiny. In the first theory, Flatiron argues that Bulldog breached the Leases when its maintenance workers spray painted over areas of rust on the Equipment. [DE 76] at 16. However, Flatiron does not identity, and the court does not perceive, what provision in the Leases this conduct supposedly violated. A breach of contract claim requires a breach of a term in the contract, *Hill*, 138 N.C. App at 26, so without identifying a specific provision, Flatiron's claim fails as a matter of law.

Flatiron's final theory, which suggests that Bulldog breached the Leases by refusing to accept the return the Equipment, also fails. Flatiron again argues that because the Equipment was delivered with defects it is relieved from its obligation to return the Equipment "free of any and all damages and/or defects." [DE 76] at 17. As discussed previously, Flatiron waived any claim for defective performance based on readily observable defects when it accepted the delivery of the Equipment, and no reasonable jury could find that the Equipment was delivered with latent defects. *See supra*, Section IV(A)(3). With that established, the Leases state that "[i]n the event the Equipment is rendered not serviceable through accidental and/or negligent damage by Lessee, the rental shall continue until the equipment is restored to serviceable condition." [DE 66-2] at ¶ 10. Whether or not Flatiron rendered the Equipment unserviceable is a question of fact central to Bulldog's claim, and in time, it may be presented to jury. *See* Am. Comp. [DE 13] at ¶ 35–36. Either way, Flatiron cannot manufacture a breach of contract counterclaim simply by disagreeing that it violated the Leases to begin with.

### 6.    Conclusion

For the aforementioned reasons, the court grants summary judgment as to Flatiron's breach of contract counterclaim in Bulldog's favor.

17

### B.    Flatiron's Quantum Merit / Unjust Enrichment Counterclaim

Flatiron brings a claim for Quantum Merit / Unjust Enrichment, alleging that Bulldog engaged in the same conduct underlying Flatiron's breach of contract counterclaim. Am. Ans. [DE 94] at ¶ 66–73. "[T]he existence of an express contract precludes recovery in *quantum meruit* and for unjust enrichment." *Deltacom, Inc. v. Budget Telecom, Inc.*, 2011 WL 2036676, No. 5:10-CV-38-FL, at *5 (E.D.N.C. May 22, 2011) (citing *Paul L. Whitfield, P.A. v. Gilchrist*, 348 N.C. 39, 42, 497 S.E.2d 412, 414 (1998)). Because both parties stipulate that the Leases were a valid contract, summary judgment as to this claim is DENIED AS MOOT. *See* Am. Comp. [DE 13] at ¶ 34; Am. Ans. [DE 94] at ¶ 43.

### C.    Flatiron's Fraudulent Concealment Counterclaim

Flatiron's fifth counterclaim alleges that Bulldog "concealed and suppressed material facts relating to the quality and condition of the Equipment, including but not limited to the number of service hours on the Equipment, and defects . . . as evidence by the Crane Inspection Reports." Am. Ans. [DE 94] at ¶ 82. Bulldog seeks summary judgment as to this claim, arguing that the information underlying Flatiron's claim was either provided, not requested, and/or not material to the Leases. [DE 66] at 19.

In North Carolina, to succeed on a claim of actual fraud, a party must show a: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007). Where a claim has alleged fraudulent concealment, it must additionally show that the other party "had a duty to disclose material information . . . as silence is fraudulent only when there is a duty to speak." *Breeden v. Richmond Cmty. Coll.*, 171 F.R.D. 189, 194 (M.D.N.C. 1997) (citing *Griffin v. Wheeler-Leonard*

18

& Co.*, 290 N.C. 185, 198, 225 S.E.2d 557, 565 (1976). In an arms-length transaction, there is

generally no duty to disclose. *Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 592, 605

(M.D.N.C. 2011). However, such a duty may arise "where one party has taken affirmative steps

to conceal material facts from the other," *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 75, 598

S.E.2d 396, 402 (2004), or where "one party has knowledge of a latent defect in the subject matter

of the negotiations about which the other party is both ignorant and unable to discover through

reasonable diligence.' *Hardin v. KCS Intern., Inc.*, 199 N.C. App. 687, 679, 682 S.E.2d 726, 734

(2009) (quoting *Olivetti Cop. V. Ames Bus. Sys., Inc.*, 319 N.C. 534, 543, 356 S.E.2d 578, 583

(1987).

To start, Flatiron cannot show that Bulldog made a false representation as to the number

of service hours attributable to the Equipment. The claim is predicated on discrepancies between

the "Hour Meter Reading" described by each of the Leases and the total number of service hours

attributable to each of the cranes. Am. Ans. [DE 94] at ¶ 82–85. For example, Flatiron alleges

that:

> In the Agreement, dated May 17, 2018, Bulldog represented that certain Equipment
> with serial number 2251173, had an Hour Meter Reading of 1,885.0 hours at the
> time [the] Agreement was entered into. Bulldog's records, however, reflect the
> equipment with serial number 2251173 had an Hours Meter Reading of 10,387
> hours in July 2010, 929 hours in August 2011, and 16,360 hours in May 2015.

*Id.* at ¶ 83. In making this argument, Flatiron treats the "Hour Meter Reading" as an affirmative

representation of the total number of service hours attributable to that machine. This reliance is in

error. The figure refers simply the number that was on the meter at the time the Leases were

entered into. *See also* Depo. [DE 82-5] at 189: 2–14 (stating that the hour meter reading is used

primarily as "a gauge for tracking how many hours is put on it a day, how many hours is put on it

a week . . ."). By their nature, the meter readings will often differ from the total number of service

hours. Robert Shirey, Bulldog's owner, testified that every 10,000 or 20,000 hours, the hour

19

meters will reset to zero. Depo. [DE 82-5] at 177:11–22, 281:8–25. Flatiron points to no other evidence concerning Bulldog's representations of the Equipment's service hours.

Moreover, Flatiron does not show that Bulldog had a duty to disclose these figures.[13] Bulldog argues that "[t]here is . . . no evidence that Flatiron made any effort to obtain the reading from the [engine control module] during due diligence, that Bulldog concealed this information, nor that Bulldog denied Flatiron any opportunity to investigate the hour meter reading issue." [DE 66] at 21. Flatiron, for its part, does not disagree. Instead, it merely argues that whether "obtaining the reading from the ECM would constitute 'reasonable diligence' is a question for the jury." [DE 76] at 23. This argument misconstrues the law. Under the "reasonable diligence" exception, Bulldog only has a duty to disclose material information if (1) it concerned a latent defect; and (2) Flatiron could not discover it using reasonable diligence. *See Hardin*, 199 N.C. App. at 679. The Equipment's service hours figure is not a defect; it is descriptive information. Flatiron does not identify evidence to show that Bulldog made efforts to conceal that information. Therefore, Bulldog did not have a duty to disclose it.

Flatiron's theory concerning the prior inspection reports is likewise deficient. Flatiron argues that in the Leases, "Bulldog represented that the cranes were delivered in 'good serviceable condition,' knowing that its own records revealed the paint was in 'poor condition.'" Am. Ans. [DE 94] at ¶ 86. The parties' dispute over whether the Equipment was delivered with latent paint defects is at the core of Flatiron's breach of contract counterclaim. North Carolina law requires courts to "limit [a party's] tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim." *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155

---

[13] This assumes without deciding that these figures were material. The figures' materiality is dubious, but ultimately, it has no effect on the court's order.

20

F.3d 331, 346 (4th Cir. 1998) (citing *Newton v. Standard Fire Ins. Co.*, 291 N.C. 105, 111, 229 S.E.2d 297, 301 (1976). Because this theory is not distinct, it cannot not form the basis for a claim of fraud.

Bulldog has met its burden of showing an absence of genuine disputes of material fact as Flatiron's fraudulent concealment counterclaim. Flatiron has failed to identify evidence that would otherwise create such a dispute, so the court thus grants summary judgment in Bulldog's favor.

**D.    Flatiron's Unfair and Deceptive Trade Practices ("UDTP") Counterclaim**

Flatiron also alleges that Bulldog engaged in UDTP by (1) intentionally misrepresenting the Equipment's total number of service hours; (2) making material misrepresentations and omissions as to the quality, condition, and service life of the Equipment; and (3) demanding that Flatiron pay for the repair of "pre-existing damages and defects." Am. Ans. [DE 94] at ¶ 74–75.

To state a claim for UDTP, a party must show "(1) an unfair or deceptive act or practice by defendant, (2) in or affecting commerce, (3) which proximately caused actual injury to [the] plaintiff." *Wilson v. Blue Ridge Elec. Membership Corp.*, 157 N.C. App. 355, 357, 578 S.E.2d 692, 694 (2003). North Carolina courts take care to distinguish between "unfair or deceptive trade practices . . . from actions for breach of contract." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 382, 781 S.E.2d 889, 892 (2016). They are "extremely hesitant to allow plaintiffs to attempt to manufacture a tort action and alleged UDTP out of facts that are properly alleged as [a] breach of contract claim." *Birtha v. Stonemore, North Carolina, LLC*, 220 N.C. App. 286, 298, 727 S.E.2d 1, 10 (2012). To cross this barrier, a party must allege "some type of egregious or aggravating circumstances." *Dalton v. Camp*, 353 N.C. 647, 657, 548 S.E. 2d 704, 711 (2001) (cleaned up). "Generally, substantial aggravating circumstances include some element of deception, such as forged documents, lies, or fraudulent inducements." *Waterford I at Cary*

*Park Condominium Homeowners Ass'n, Inc. v. Nationwide Prop. and Casualty Ins. Co.*, 669 F. Supp. 531, 536 (E.D.N.C. 2023).

The parties' discussion of this claim largely incorporates by reference their arguments concerning fraud. Bulldog continues to maintain that Flatiron cannot demonstrate the falsity of any representation, and Flatiron argues that there "is ample evidence [that] Bulldog engag[ed] in fraud." *See* [DE 66] at 26; [DE 76] at 26. For the reasons stated above, the court rejects Flatiron's argument.

Flatiron cannot otherwise show the presence of aggravating circumstances. Flatiron argues that Bulldog's "absolute position" that the Equipment must be repaired "to a condition far exceeding any reasonable reading" of the Leases carries this case beyond a contractual dispute and "provides strong evidence of bad faith." [DE 76] at 27. Flatiron also points to Bulldog's "insistence upon charging Flatiron rent for cranes it refuses to take back." *Id.* These arguments are unsound. "A mere breach of contract, even if intentional, is not an unfair or deceptive act under Chapter 75." *Bob Timberlake Collection, Inc. v. Edwards*, 176 N.C. App. 33, 42, 626 S.E.2d 315, 323 (2006). The circumstances identified by Flatiron result from Bulldog's contrary interpretation of the Leases[14], not from allegations of fraud or deception. At its core, this is a contractual dispute, and it would be "inconsistent both with North Carolina law and sound commercial practice" to allow Flatiron "to shoehorn this case into a tort framework." *Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp.*, 15 F.3d 327, 329 (4th Cir. 1994).

For these reasons, summary judgment as to Flatiron's UDTP claim is granted in Bulldog's favor.

---

[14] Article 10 of the Leases states, "[i]n the event the Equipment is rendered not serviceable through accidental and/or negligent damage by Lessee, the rental shall continue until the Equipment is restored to serviceable condition, and all costs for accomplishing the repairs shall be paid by Lessee." [DE 66-2] at ¶ 10.

### E. Flatiron's Fraud and/or Mistake Defense

In its amended answer, Flatiron raises the defense of fraud and/or mistake. Am. Ans. [DE 94] at 8. Bulldog seeks summary judgment as to this defense under the same rationale it offered when discussing Flatiron's fraudulent inducement claim. [DE 66] at 27. Flatiron likewise argues that summary judgment is inappropriate "for the same reasons" raised when discussing the fraud counterclaim. [DE 76] at 28.

For the reasons described above, summary judgment as to this defense is granted in Bulldog's favor.

### F. Bulldog's Request for Declaratory Judgment

Bulldog seeks a declaration as to the parties' legal rights under the Leases as to the following propositions:

> 1. The Leases are valid contracts.

Both parties stipulate that the Leases are valid contracts. *See* Am. Comp. [DE 13] at ¶ 34; Am. Ans. [DE 94] at ¶ 43. The court will issue a declaration to that effect.

> 2. Flatiron agreed that it received the Equipment in good serviceable condition.

For the reasons described in Section IV(A)(1), the unambiguous language of the Leases only establishes that Flatiron agreed that the Equipment was *shipped* in good serviceable condition. The court will issue a declaration to that effect.

> 3. Flatiron was required to promptly inspect the Equipment upon delivery and notify Bulldog in writing of any readily observable damages and/or defects in the Equipment within twenty-four (24) hours.

Article 8 of the Leases states that "Lessee shall examine [the] Equipment promptly upon delivery and notify Lessor in writing of readily observable defects within twenty-four (24) hours of readily observable evidence that [the] Equipment is not in such condition." [DE 66-2] at ¶ 8.

Flatiron opposes this declaration, arguing that "[t]he Cranes are extraordinarily large pieces of machinery, which arrive in multiple truckloads, and necessarily require more than 24 hours to inspect." [DE 76] at 28–29. It also points to language in Article 8 that requires Flatiron to employ a "Qualified Person" once the Equipment is fully erected. *Id.* at 29.

Neither argument directly addresses the plain language of Article 8, which unambiguously imposes on Flatiron the obligation to promptly inspect the Equipment upon delivery and notify Bulldog within twenty-four hours of any evidence of readily observable defects. The directive to hire a Qualified Person applies only once the Equipment is fully erected, and it continues to have effect through the entirety of the leasing period [DE 66-2] at ¶ 8 (specifying that the Qualified Person shall conduct both initial and periodic inspections). Further, regardless of any difficulty occasioned by having to inspect the Equipment within twenty-four hours, that was the arrangement Flatiron agreed to, and it cannot now avoid declaratory judgment because that arrangement is burdensome. The court will issue the proposed declaration.

4. The Leases require Flatiron to maintain and return the Equipment in good operating condition, well-greased, oiled, cleaned, repaired, in accordance with all specifications, fully operational, and free from any and all damages and/or defects.

Article 10 of the Leases states that: "[t]he Lessee . . . shall at its own expense maintain the Equipment in good operating condition, well-greased, oiled, cleaned and repaired, and shall return it to Lessor in such condition." [DE 66-2] at ¶ 10. Flatiron argues that the parties "modified Article 10 when [they] agreed Bulldog would provide a technician . . . to perform scheduled maintenance on the Equipment." [DE 76] at 29. It also argues that any such obligation has a condition precedent, namely that the Equipment was delivered "free from any and all damages and/or defects." *Id.*; *see also* [DE 66-2] at ¶ 10. Finally, it points to Article 18 of the Leases,

24

which states that "Lessor shall make an inspection upon return of the Equipment, such inspection to be at Lessor's expense." [DE 66-2] at ¶ 18.

Under North Carolina law, "written contracts are to be construed and enforced according to their terms." *Canteen v. Charlotte Metro Credit Union*, 386 N.C. 18, 22, 900 S.E.2d 890, 894 (2024). Any alteration of the terms of the contract "must be supported by new consideration." *Id.* (citing *Wheeler v. Wheeler*, 299 N.C. 633, 637, 262 S.E.2d 763, 765 (1980)).

Flatiron identifies no evidence to supports its claim that a legal modification to this effect was enacted. This claim seems to refer to an email from Bulldog that states:

> Provided Flatiron Constructors hires and pays for Bulldog Erectors' technician for technical support during the assembly and dis-assembly of our cranes for the Rodanthe, NC project, after delivery of the 3rd crane, Bulldog will supply a technician for up to 40 hours per week for scheduled maintenance at no charge to Flatiron Constructors. Flatiron will remain responsible for daily maintenance and all consumables.

[DE 82-7]. The language in the email does not purport to change the terms of Article 10, and in any event, its terms do not conflict with the other provisions in the Leases. In the email, Bulldog agreed to provide technicians to perform certain scheduled maintenance if Flatiron first hired them to assist with assembly and disassembly of the Equipment, as contemplated in Article 2. *See* [DE 66-2] at ¶ 2 (describing the hourly and minimum billing rates for Bulldog technicians hired to assist with assembly and disassembly). Further, the email makes clear that Flatiron remains responsible for daily maintenance, as Article 10 requires, and it does not otherwise address Flatiron's obligation to return the Equipment in good operating condition. Flatiron attests to this understanding in a September 1, 2021, email, where Adrian Price states, "Flatiron agrees that there is going to need to be work done to these cranes with regards to restoring paint and replacing components and the responsibility lies with Flatiron as laid out in the terms of the agreement."

[DE 68-6]. The court finds there to be insufficient evidence to find that a legal modification to the Leases was enacted.

Article 18 does not otherwise muddle the parties' obligations. Article 18 requires that *upon return of Equipment*, Bulldog shall inspect the Equipment at its expense. [DE 66-2] at ¶ 18. This is an entirely separate issue to who is responsible for maintenance during the project, so it does not apply.

Finally, as to condition precedent issue, Article 10 states, "Lessee shall have the duty to periodically inspect, test, and certify at its own cost, that the Equipment is in accordance with specifications and is fully operational and free from any and all damages and/or defects upon receipt of Equipment *free from any and all damages and/or defects* as required by Article 8." *Id.* at ¶ 10 (emphasis added). Notably, this sentence, unlike the one prior, does not address maintenance of the Equipment, so it is unclear whether the italicized language applies to the proposed declaration. In any event, the court has granted summary judgment as to Flatiron's breach of contract counterclaims, so Flatiron is estopped from advancing this argument.

The court will issue the proposed declaration.

> 5.  The Leases require Flatiron to restore the paint and metal damaged by exposure to the coastal environment, which includes corrosion damage.

Article 10 of the Leases states in part, "Lessee shall pay special attention toward cleaning and protecting the Equipment when working the equipment at a location where destructible chemical agents are present in the atmosphere. Lessee shall be responsible for this protection and to clean all corrosive agents from the Equipment, and restoring the condition of the metal and paint on the Equipment prior to returning the Equipment to Lessor . . . Lessee shall be responsible for this protection and to clean all corrosive agents from the Equipment, and restoring the condition

of the metal and paint on the Equipment prior to returning the Equipment to Lessor" [DE 62-2] at ¶ 10.

Flatiron opposes this declaration, arguing that a genuine issue of material facts exists as to whether the project site had "destructible chemical agents" and whether any damage to the paint and metal were caused by "exposure to the coastal environment," as opposed to latent defects

Bulldog has not sought summary judgment as to its own breach of contract claim, so whether the Equipment was damaged by exposure to a costal environment is an open question for a jury. To the extent Bulldog can make a sufficient factual showing at trial, the plain language in the Leases speaks clearly as to Flatiron's obligations. The court declines to issue the proposed declaration.

> 6. The Leases require Flatiron to test and certify the cranes to verify the Equipment has been returned to the condition in which it was received prior to returning the Equipment to Bulldog.

Article 10 of the Leases states, "the Lessee hereby agrees to employ competent, experienced persons to operate and maintain said Equipment and shall at its own expense maintain the Equipment in good operating condition . . . and shall return it to Lessor in such condition. Lessee shall have the duty to periodically inspect, test, and certify at its own cost, that the Equipment is in accordance with specifications and is fully operational and free from any and all damages and/or defects upon receipt of Equipment free from any and all damages and/or defects as required in Article 8 . . . Lessee shall be responsible for this protection and to clean all corrosive agents from the Equipment, and restoring the condition of the metal and paint on the Equipment prior to returning the Equipment to Lessor." [DE 66-2] at ¶ 10.

Flatiron opposes the proposed declaration, again arguing that any such obligation is contingent on the Equipment being delivered in good condition, and regardless, Article 18 imposes on Bulldog the obligation to inspect the Equipment after their return. [DE 76] at 30–31. For the

27

reasons described previously, these arguments are rejected. The proposed language accurately summarizes Flatiron's obligations under the Leases, so the court will issue the declaration.

## V.  Conclusion

For the aforementioned reasons, Bulldog's Motion for Partial Summary Judgment [DE 65] is GRANTED IN PART and DENIED AS MOOT IN PART. The court enters judgment in Bulldog's favor as to Flatiron's breach of contract, fraudulent concealment, and UDTP counterclaims, as well as for Flatiron's Eighth Defense of Fraud and/or Mistake. Furthermore, the court enters declaratory judgment as follows:

1. The Leases, as shown in [DE 66-2], are valid contracts.

2. By signing the Leases, Flatiron agreed that the Equipment was shipped in good serviceable condition.

3. Flatiron was required to promptly inspect the Equipment upon delivery and notify Bulldog in writing of any readily observable damages and/or defects in the Equipment within twenty-four (24) hours.

4. The Leases require Flatiron to maintain and return the Equipment in good operating condition, well-greased, oiled, cleaned, repaired, in accordance with all specifications, fully operational, and free from any and all damages and/or defects.

5. The Leases require Flatiron to test and certify the cranes to verify the Equipment has been returned to the condition in which it was received prior to returning the Equipment to Bulldog.

SO ORDERED this _14th_ day of March, 2025.

_Richard E. Myers II_
RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

28